**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SYNCORA GUARANTEE INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **COMPLAINT** |
| | ) |
| HOUSTON CASUALTY COMPANY, | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff Syncora Guarantee Inc., ("Syncora"), by and through its undersigned counsel, for its Complaint against Houston Casualty Company ("HCC"), alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises out of HCC's wrongful refusal to pay Syncora's costs of defense and settlement in connection with Securities Claims brought against Syncora falling squarely within the coverage of a Directors, Officers and Corporate Liability Policy sold by HCC and covering Syncora for precisely such liabilities.

2. The insurance policy at issue was designed to, and does, protect the insureds, including Syncora against Securities Claims, which include both Claims brought by securities holders of the "Company" – Syncora's parent company, Syncora Holdings Ltd. ("Holdings") and its subsidiaries – and Claims arising from the purchase or sale, or offer to purchase or sell securities issued by the Company.

3. In April 2017, Syncora was named as a defendant in, and subsequently settled, a derivative action in New York County styled *RMBS Recovery Holdings I LLC, et al., v. Syncora Guarantee, Inc.,* 652198/2017 (N.Y. Sup. Ct., N.Y. Cnty) (the "Derivative Action"). The

Derivative Action arose out of multiple offerings of securities issued in connection with a restructuring of Syncora, pursuant to which Syncora issued, or  caused to be created several Delaware statutory trusts (each a "UCF Trust") the assets of each of which consisted of (1) a class of residential mortgage-backed securities insured by Syncora ("RMBS") and (ii) the rights to amounts paid as reimbursements for certain claims on the insurance policy relating to such RMBS, solely to the extent that such amounts were paid by the trustee of the RMBS pursuant to the operative document for the underlying RMBS (the "Reimbursement Rights").  Each UCF Trust issued two classes of trust certificates:  an "uninsured cash flow" certificate (each a "UCF Certificate") and an "insured cash flow" certificate (each an "ICF Certificate").  Syncora sponsored the creation of the UCF Trusts, transferred Reimbursement Rights to the UCF Trusts and acted as depositor for certain of the UCF Trusts. The Derivative Action, brought by certain UCF Certificate holders on behalf of the UCF Trusts, alleged that Syncora, in a tender offer to purchase the RMBS, misrepresented to investors the scope of the Reimbursement Rights, specifically the extent to which the UCF Certificate holders would be entitled to recoveries from litigation against RMBS sponsors.  Plaintiffs alleged that Syncora, in the offer to purchase, had represented that it would assign all rights to recoveries from whatever source to the UCF Trusts and not just the Reimbursement Rights, and that the claimed promise of expanded recoveries was a major inducement to investors to agree to acquire the UCF Certificates.  Syncora denied those allegations, and maintained that, as part of the transactions in question, it had assigned only the Reimbursement Rights from the underlying RMBS trusts.

   4.  Because Syncora acted as depositor for certain of the UCF Trusts, the Derivative Action arose directly from the "purchase or sale of, or offer to purchase or sell" securities "issued by the Company." In addition, Syncora held the majority of interests in certain of the

UCF Trusts and 100% of the ICF Certificates of all of the UCF Trusts. Syncora, as the sole holder of the ICF Certificates, has the right, together with the UCF Trustee, to amend the related UCF Trust agreements and the right to remove or replace the UCF Trustee. As a result, the UCF Trusts are part of the insured "Company" as Subsidiaries of Syncora and, thus, of Holdings. Accordingly, the Derivative Action satisfied either definition of a Securities Claim, as it both was brought "by or on behalf of one or more securities holders of the Company in their capacity as such" and arose from "the purchase or sale of, or offer to purchase or sell" securities "issued by" the Company.

5.     Despite this, HCC has refused to pay any portion of Syncora's defense costs or eventual settlement of the Derivative Action, largely on the ground that it did not constitute a Securities Claim. HCC has persisted in that position, despite not only Syncora's repeated requests for reconsideration, but its provision of detailed legal support for its coverage position.

6.     As a result of HCC's recalcitrance and breach of the policy terms, Syncora has been forced to pay alone the costs of defense and settlement of an action HCC promised to pay, and for which it received substantial premiums. This action seeks recovery of those amounts, as well as the pre- and post-judgment interest necessary to make Syncora whole.

## PARTIES AND RELEVANT NON-PARTY ENTITES

7.     Plaintiff Syncora is a New York corporation with its principle place of business in New York. Syncora is a subsidiary of non-party Holdings, which indirectly owns 100% of Syncora's shares.

8.     Defendant HCC is a Texas corporation with its principal place of business in Houston, Texas. On information and belief, at all material times HCC has conducted substantial business within the State of New York, including engaging in the business of selling insurance,

3

investigating claims, and/or issuing policies that cover policyholders or activities located in New York.

9.      Non-parties "Underlying Plaintiffs" refers to four limited liability companies – RMBS Recovery Holdings I, LLC, RMBS Recovery Holdings II, LLC, RMBS Recovery Holdings III, LLC and RMBS Recovery Holdings IV, LLC – organized and existing under the laws of Delaware, with their principal places of business in New York County.  The Underlying Plaintiffs are beneficial owners of certain UCF Certificates of the UCF Trusts.

10.      Non-parties "UCF Trusts" refers, individually and collectively, to the following Delaware statutory trusts:  VSACO2009-1 8QA2, SACOD 2010-1A 8QA2, VBSSP 2009-1 PEM8, BSSPD 2010-1A A and GRNPT 2010-1A JAA4.  All of the ICF Certificates issued by the UCF Trusts are held by Syncora.

**JURISDICTION AND VENUE**

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This action is between citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

**FACTUAL BACKGROUND**

A.      **THE INSURANCE POLICIES**

13.      In consideration of the payment of substantial premiums to cover precisely the type of claims at issue here, HCC sold to Holdings a Directors Officers and Corporate Liability Insurance Policy number 14-MG-16-A12939 (the "Policy").  A copy of the Policy is annexed hereto as Exhibit A.

4

14.     The Policy provides $20 million in coverage for Securities Claims against "the Company," subject to a $1 million retention.

15.     "The Company" is defined under the Policy as the "Named Corporation and any Subsidiary thereof."  "Subsidiary" is further defined as any entity in which the Named Corporation either directly or indirectly through one or more other Subsidiaries owns more than 50% of the securities representing the right to vote for the election of such entity's directors or the legal equivalent thereof.

16.     The "Named Corporation" is Holdings.

17.     Under the terms of the Policy, including the definition of "the Company" both Syncora and the UCF Trusts constitute part of the insured Company.

18.     The Insuring Agreement of the Policy states that the Insurer will pay to or on behalf of the Company Loss arising from "Securities Claims first made during the Policy Period . . . against the Company for Wrongful Acts."

19.     "Claim" is defined to include "any written demand for monetary or non-monetary relief" and "any civil proceeding commenced by service of a complaint or similar pleading[.]"

20.     "Loss" is defined as "Defense Costs and any damages, settlements, judgments or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if any where insurable by law) that…the Company is legally obligated to pay as a result of any Securities Claim[.]"

21.     "Defense Costs" is defined as "reasonable fees (including expert witness fees), costs and expenses consented to by the Insurer . . .  resulting from the investigation, adjustment, defense or appeal of a Claim against an Insured Person (or, with respect to Securities Claims,

against any Insured)…."    Under the terms of the Policy, once the $1 million retention is satisfied, HCC is required to contemporaneously pay Defense Costs as they are incurred.

22.    "Securities Claim" is defined as a "Claim" which "(1) is brought by or on behalf of one or more securities holders of the Company in their capacity as such, or (2) arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market."

23.    "Wrongful Act" is defined as including any "actual or alleged act, error, misstatement, misleading statements, omission or breach of duty…with respect only to Securities Claims, by the Company[.]"

24.    The Policy provides that the Insured shall have control of the defense of any Claim.

## B.    THE DERIVATIVE ACTION

### 1.    Creating and Marketing Residential Mortgage Backed Securities

25.    The process of creating and marketing a RMBS begins when a "sponsor" purchases several thousand mortgages held by banks or home lenders into a pool, paying the banks and lenders for the right to receive the payments on the mortgages.  It then sells the pool to a "depositor," usually an affiliate of the sponsor, which assigns the mortgages to a "special purposes vehicle" ("SPV").  The SPV divides the pool into one or more "classes."  The classes may differ in the priority of repayment and the allocation of losses; senior classes get paid from the proceeds of the underlying mortgages first, with junior classes being paid on a lower priority and/or absorbing the losses prior to allocation to the senior classes.  Because the junior classes bear a greater risk that there will not be funds to pay them back, they get a greater return.

26.     An underwriter then sells the RMBS to investors.  The sponsor makes its profit on the difference between the amount it paid to acquire the mortgages and the amount for which the RMBS are sold.  The investors make their money on the income from the underlying mortgages which back their RMBS.

27.     A third-party servicer is responsible for collecting mortgage payments, monitoring delinquencies, deciding when to foreclose on loans and otherwise overseeing the payment stream on behalf of the SPV.  Every month, based on that information, the trustee reports to the certificate holders/investors on the performance of the loans in reports whose contents must comply with certain SEC regulations.

28.     In some instances, in order to make the RMBS safer and thus more marketable, an insurer will guarantee the payment of principal and interest on one or more of the classes of securities.  As a condition to agree to issue a policy of insurance for an RMBS, the insurer would be granted subrogation rights to recover claim payments made by the insurer on the RMBS.  The governing document of the underlying RMBS trust would specifically set forth the obligation of the underlying RMBS trust to pay such amounts out of cash flow on the underlying trust assets.  In addition, the loan originators and the sponsor make certain representations directly to the insurer about the mortgage loans, for example, the creditworthiness of the underlying mortgages, the underwriting standards of the originators, or the quality control processes of the sponsor.  If those representations are false, resulting in a loss, the insurer can seek recovery from the originators and sponsors of those amounts directly outside of the related RMBS trust, in addition to the Reimbursement Rights available from amounts received from the underlying mortgages.

    **2.     Transactions Underlying And Allegations Of The Derivative Action**

29.     Prior to the mortgage crisis of the late 2000's, Syncora agreed to insure RMBS issued by certain underlying RMBS trusts.  Beginning in the second half of 2007, as the mortgage crisis hit, and more mortgages went into default, Syncora was forced to pay out substantial losses on the insured RMBS.  In April 2009 the New York State Insurance department issued an order directing Syncora to cease all claims payments until it could replenish its statutorily-required surplus.

30.     In an effort to restore its surplus, Syncora took steps to restructure its obligations by creating, or causing the creation of several UCF Trusts and selling the UCF Certificates related thereto.  In order to obtain the benefit of the transactions, Syncora was required to be (and has always been) the sole holder of the ICF Certificates issued by each UCF Trust and the depositor and UCF Certificate holder for certain of the UCF Trusts.

31.     As the initial part of that restructuring, Syncora made a tender offer to purchase certain insured RMBS, including RMBS included in the four UCF Trusts that ultimately became Underlying Plaintiffs in the Derivative Action.  Under the original terms of the tender offer, the RMBS holders were given three choices.  First, they could decline the tender, and be left with RMBS "insured" by a company that was no longer allowed to pay out on the losses the RMBS holders were suffering.  Second, they could sell their RMBS outright to Syncora for a fixed amount, although this option was eliminated prior to the closing of the tender offer.  Third, they could exchange their RMBS for (1) a smaller amount of cash and (2) certificates in a new trust that would not be insured – the "uninsured cash flow" or "UCF" Certificates. The RMBS holders would thus get a cash payment and the right to continue to receive cash flow from the RMBS, to the extent that there was any.  As part of that tender offer option, Syncora agreed to

assign to the UCF Trusts its Reimbursement Rights from the related RMBS trust for any insurance claim payments it would make after April 27, 2009.

32.     The Derivative Action complaint, however, erroneously alleged that Syncora had assigned broader recovery rights as part of the tender offer, and that the "upside" potential of those recoveries was a key inducement to the RMBS holders to tender their securities rather than take the pure cash payout – which was not, in any event, available at the time the tender offer was closed.

33.     The tender offer also provided that Syncora would be required to retain each of the ICF Certificates in the UCF Trusts.

34.     Syncora was the sponsor of the transactions underlying the Derivative Action. With respect to the UCF Trusts created in the tender offer, among other things, Syncora selected the RMBS to be included in the tender offer, determined and funded the cash payment amount, and paid for all expenses relating to the tender.  With respect to other UCF Trusts at issue, it was the depositor and the sole Certificate holder of the UCF Trust.

35.     Under the federal securities regulations applicable to mortgage-backed securities, a depositor is an "issuer" of the security.  Accordingly, as a matter of law, Syncora, as depositor, was an issuer of the UCF Trust Certificates for those UCF Trusts for which it acted as depositor.

36.     On April 24, 2017, the Underlying Plaintiffs filed the complaint in the Derivative Action (the "Derivative Complaint") alleging that Syncora had failed to comply with promises that it allegedly made in connection with sales of UCF Certificates as part of the restructuring, to assign all reimbursements received by Syncora in any capacity to the UCF Trusts, and had instead retained certain reimbursements, including a $200 million settlement made directly to Syncora as insurer for the RMBS trusts (to which Syncora was entitled).  The Derivative

Complaint further alleged that, in violation of Syncora's alleged promise to pay all such settlement amounts to the UCF Trusts, the trustee for the UCF Trusts, BNY Mellon, had continued to make payments totaling $22 million to Syncora which the Underlying Plaintiffs claimed should have been assigned for the benefit of the UCF Trusts.  Finally, it alleged that J.P. Morgan had recently agreed to a global settlement with more than 300 trusts nationwide, $60 million of which was allocable to the RMBS trusts that are included in the UCF Trust and which, absent court intervention, would be paid in whole or in part to Syncora and which the Underlying Plaintiffs alleged should have been assigned to the UCF Trusts and paid to the UCF Certificate holders.

37.     Based on these allegations, the Derivative Complaint sought damages in an amount to be determined at trial, prejudgment interest, the imposition of a constructive trust on all reimbursement amounts Syncora had received in respect of insurance payments on the RMBS made after April 27, 2009, and declaratory relief.

## C.   HCC DENIES COVERAGE FOR SYNCORA'S COSTS INCURRED IN THE DERIVATIVE ACTION

38.     In May of 2017, Syncora, through its insurance broker, timely notified HCC of the Derivative Action.

39.     Two months later, in July of 2017, HCC denied coverage on the ground that it claimed that the Derivative Action was not a "Securities Claim" under the Policy.  Specifically, HCC asserted that the Derivative Action did "not arise from the purchase or sale of, or offer to purchase or sell, any securities issued by Syncora."

40.     Syncora vigorously contested HCC's coverage position in a letter dated September 6, 2017, pointing out that Syncora, as depositor of the certificates, was an issuer of the certificates.

41.     Nevertheless, HCC reiterated its coverage position in a letter dated December 5, 2017, and further noted that the reason the Derivative Action did not constitute a Securities Claim was because, according to HCC, the certificates were issued by the UCF Trusts and not Syncora and, therefore, the Derivative Action does not arise from the purchase or sale of, or offer to purchase or sell, securities *issued* by Syncora.  HCC further argued that even if the certificates had been issued by Syncora, the Derivative Action does not "arise from the purchase or sale of, or offer to purchase or sell, any securities."

42.     After HCC denied coverage, Syncora settled the Derivative Action on or about December 31, 2017 (the "Settlement").

43.     Syncora and HCC met in April of 2018 to discuss coverage for the settlement. Syncora followed that meeting with a letter dated May 23, 2018, in which Syncora addressed issues raised by HCC at the meeting and in HCC's December 5, 2017 letter including explaining again Syncora's legal status as the issuer of the UCF Trust Certificates.  Syncora also explained in that letter, that because the UCF Trusts themselves were part of the "Company," the Derivative Action was a claim brought by holders of the Company's securities in their role as such, and, thus, a Securities Claim.

44.     Despite Syncora's detailed explanation for its entitlement to coverage, in a letter dated October 15, 2018, HCC once again denied coverage, effectively reiterating its prior coverage positions.

45.     As of the date hereof, Syncora has suffered covered Loss of no less than $11 million, including Defense Costs of $838,519, in connection with the Derivative Action.

46.     To this date, HCC has not paid any portion of that amount.

## FIRST CAUSE OF ACTION
**(Breach of Contract)**

47.     Syncora repeats and re-alleges the allegations set forth in the preceding paragraphs 1-46 of this Complaint as if fully set forth herein.

48.     Pursuant to the terms of the Policy, HCC agreed to pay Loss arising from a Securities Claim against the Company for any Wrongful Act.

49.     The Derivative Action alleges Wrongful Acts against Syncora arising out of the purchase or sale of, or offer to purchase or sell securities issued by Syncora and, thus, constitutes a covered Securities Claim under the terms of the Policy.

50.     In addition, the Derivative Action constitutes a Claim by shareholders of the Company within the meaning of the Policy in their capacity as such, and, thus, qualifies as a Securities Claim on this separate and alternative ground.

51.     The costs incurred by Syncora in its defense and settlement of the Derivative Action constitute Loss within the meaning of that term in the Policy.

52.     Syncora has fully complied with all terms, conditions and prerequisites to coverage set forth in the Policy, including the satisfaction of all applicable retentions, or has been excused from compliance with such terms, conditions or prerequisites as a result of HCC's breaches and/or other conduct.

53.     HCC nonetheless has refused and failed to fulfill its obligation to pay Syncora's defense and settlement costs incurred in the Derivative Action.

54.     As a result of HCC's breach of its obligation to pay Syncora's defense and settlement costs resulting from the Derivative Action, subject to its policy attachment point, Syncora has suffered damages in an amount to be determined at trial, but no less than $75,000, exclusive of costs and interest.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment )

55.     Syncora repeats and re-alleges the allegations set forth in the preceding paragraphs 1-54 of this Complaint as if fully set forth herein.

56.     Pursuant to the terms of the Policy, HCC agreed to pay Loss arising from a Securities Claim against the Company for any Wrongful Act.

57.     The Derivative Action alleges Wrongful Acts against Syncora arising out of the purchase or sale of, or offer to purchase or sell securities issued by Syncora and, thus, constitutes a covered Securities Claim under the terms of the Policy.

58.     The costs incurred by Syncora in its defense and settlement of the Derivative Action constitute Loss incurred as a result of a Securities Claim under the terms of the Policy.

59.     Syncora falls within the Policy definition of the "Company."

60.     HCC's obligation to pay Loss incurred by Syncora in the Derivative Action is not exempted by any exclusion in the Policy.

61.     Syncora has fully complied with all terms, conditions and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of HCC's breaches and/or other conduct.

62.     Thus, under the terms of the Policy, HCC is obligated to cover the costs incurred by Syncora in its defense and settlement of the Derivative Action.

63.     Nevertheless, HCC has failed to fulfill its obligation to pay Syncora's defense and settlement costs incurred in the Derivative Action, subject to its policy attachment point and limits of liability.

64.     As a result an actual and justiciable controversy exists between the parties regarding the existence and scope of HCC's obligations under the Policy to pay Syncora's defense and settlement costs associated with the Derivative Action.

65.     The issuance of declaratory relief will resolve this controversy.

66.     Pursuant to 28 U.S.C. § 2201, Syncora is entitled to judgment declaring that HCC is obligated to pay Syncora's defense and settlement costs incurred in connection with the Derivative Action, subject to HCC's applicable attachment point and limit.

**PRAYER FOR RELIEF**

WHEREFORE, Syncora prays for relief as follows:

(a) On the First Cause of Action, for judgment against HCC, awarding Syncora (1) compensatory and consequential damages in an amount to be determined in this action, but no less than $75,000; and (2) pre- and post-judgment interest on that amount;

(b) On the Second Cause of Action, judgment declaring that HCC is obligated to pay Syncora's defense and settlement costs incurred in connection with the Derivative Action;

(c) On all Causes of Action, awarding all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

(d) On all Causes of Action, awarding such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Syncora hereby demands a trial by jury on all issues so triable.

MCKOOL SMITH, P.C.

By: _____

Robin L. Cohen
Elizabeth Sherwin
Orrie A. Levy
One Bryant Park – 47th Floor
New York, NY 10036
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

*Attorneys for Plaintiff*

Dated: December 11, 2018